**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

PAUL SPECHT, as adminstrator of the
estate of Daniel Specht,

        Plaintiff,

vs.

KUBOTA TRACTOR CORPORATION
et al.,

        Defendants.

No. 16-CV-1012-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . **2**

IV.    *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . . . **3**

V.     *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . **4**

     *A.*     *Daniel Specht's Farming Operation* . . . . . . . . . . . . . . . . . . . . . **4**
     *B.*     *Characteristics of Kubota Tractor and Loader* . . . . . . . . . . . . . . . **5**
     *C.*     *Equipment Malfunction and Accident* . . . . . . . . . . . . . . . . . . . **7**
     *D.*     *Condition of Tractor and Loader* . . . . . . . . . . . . . . . . . . . . . . **8**

VI.    *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

     *A.*     *Expert Opinions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
     *B.*     *Design Defect* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
           *1.*     *Reasonable alternative design and reduction of foreseeable
                  harm* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
           *2.*     *Causation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
     *C.*     *Inadequate Instructions and Warnings* . . . . . . . . . . . . . . . . . . . **22**

VII.   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

# I. INTRODUCTION

The matter before the court is Defendants Kubota Tractor Corporation, Kubota Corporation, Kubota Manufacturing of America Corporation and Kubota Industrial Equipment Corporation's (collectively, "Kubota") Motion for Summary Judgment ("Motion") (docket no. 19).

# II. PROCEDURAL HISTORY

On July 2, 2015, Plaintiff Paul Specht filed a Petition (docket no. 3) in the Iowa District Court for Allamakee County, alleging eight claims against Kubota and two claims against Defendant Gary's Tractor & Implement, Inc. Specht alleges: (1) strict liability design defect against Kubota; (2) negligent design against Kubota; (3) failure to warn against Kubota; (4) post-sale failure to warn against Kubota; (5) breach of implied warranty of fitness for a particular purpose against Kubota and Gary's Transport & Implement, Inc.; (6) breach of express warranty against Kubota and Gary's Transport & Implement, Inc.; (7) breach of implied warranty of merchantability against Kubota; and (8) conduct warranting punitive damages against Kubota. On October 19, 2015, Kubota filed an Answer (docket no. 4). On March 24, 2016, Specht dismissed his claims against Gary's Transport & Implement, Inc. with prejudice. *See* Dismissal (docket no. 5). On April 15, 2016, Kubota removed the case, bringing it before the court. *See* Notice of Removal (docket no. 2). On March 28, 2017, Kubota filed the Motion. On April 25, 2017, Specht filed a Resistance (docket no. 26). On May 8, 2017, Kubota filed a Reply (docket no. 3). Kubota requests oral argument, but the court finds oral argument to be unnecessary. The matter is fully submitted and ready for decision.

# III. SUBJECT MATTER JURISDICTION

Prior to his death, Daniel Specht ("Daniel") was a citizen and resident of Iowa. Notice of Removal ¶ 10. Accordingly, Specht is a citizen and resident of Iowa. *Id.* ¶ 11; *see also* 28 U.S.C. § 1332(c)(2) ("[T]he legal representative of the estate of a decedent

shall be deemed to be a citizen only of the same State as the decedent . . . .").  Kubota Tractor Corporation is a California corporation with its principal place of business in California.  *Id.* ¶ 12.  Kubota Corporation is a Japanese corporation with its principal place of business in Osaka, Japan.  *Id.* ¶ 13.  Kubota Manufacturing of America Corporation and Kubota Industrial Equipment Corporation are Georgia corporations with their principal places of business in Georgia.  *Id.* ¶¶ 14-15.

The court has original jurisdiction over the claims in the Petition because complete diversity exists between Specht and the Kubota defendants and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332(a)(1), (2) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States [or] citizens of a State and citizens or subjects of a foreign state . . . .").

## IV. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'"  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Celotex*, 477 U.S. at 324).

The court must view the record in the light most favorable to the non-moving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case necessarily renders all other facts immaterial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (alteration omitted) (quoting *Celotex*, 477 U.S. at 322-23).

## V. *RELEVANT FACTUAL BACKGROUND*

Viewing the evidence in the light most favorable to Specht and affording him all reasonable inferences, the uncontested material facts are as follows.

This case arises from the death of decedent Daniel, which resulted from injuries sustained while using a Kubota tractor and loader.

### A. *Daniel Specht's Farming Operation*

Daniel was raised near Monticello, Iowa, where he assisted on his family's farm. Kubota Statement of Undisputed Material Facts ("Kubota Facts") (docket no. 19-1) ¶¶ 1-2. Growing up, Daniel was instructed on the operation and maintenance of farm equipment. *Id.* ¶ 2. As an adult, Daniel continued farming as a career. *Id.* ¶ 3. Initially, Daniel farmed in a family corporation with his brothers, Paul and Philip Specht. *Id.* ¶ 4. Eventually, Daniel transitioned to a solo farming operation wherein he raised grass-fed organic cattle. *Id.* ¶¶ 5-6. Daniel's operation consisted of farming approximately 420 acres of land, performing duties that included moving hay bales using a tractor and loader. *Id.* ¶¶ 7-10. Daniel carried a toolbox while performing farming duties, which contained WD-40 lubricant. *See* Plaintiff's Statement of Additional Material Facts ("Specht Facts")

(docket no. 26) ¶ 70; Specht Appendix (docket no. 26-2) at 245-46.

Prior to purchasing the tractor and loader at issue in this case, Daniel had previously owned and operated another tractor and loader. Kubota Facts ¶¶ 11-12. Daniel used the prior tractor and loader to move hay bales—utilizing a rear attachment and the loader, which was outfitted with a bale spear designed to secure the hay bales onto the loader. *Id.* ¶¶ 13-14. To the degree that any maintenance of the prior tractor and loader was required and performed, Daniel was the only person that performed such maintenance. *See id.* ¶ 15.

On January 31, 2005, Daniel bought the tractor and loader at issue in this case. *Id.* ¶ 16. The tractor and loader were designed, manufactured, marketed and distributed by Kubota. *Id.* ¶¶ 18-19. At the time that he purchased the Kubota tractor and loader, Daniel also purchased pallet fork attachments for the loader, which were designed to aid in the lifting and moving of pallets. *See id.* ¶ 17. Daniel did not purchase a bale spear or any other loader attachment designed to secure hay bales. *See id.* Daniel was the primary user of the tractor and loader, but Philip used the equipment occasionally and Paul used it once. *Id.* ¶ 21.

### B. Characteristics of Kubota Tractor and Loader

The Kubota loader is a piece of equipment that mounts onto the front of the Kubota tractor. *See id.* ¶¶ 23-24. The loader is primarily intended for digging, hauling and moving loads and may be fitted with various attachments to assist users with those tasks. *See id.* ¶ 23. The loader arms contain sixteen joints that articulate to raise and lower the loader. *See id.* ¶ 25. Each of the sixteen joints are equipped with "grease zerks," which allow grease to be inserted into the joints as lubrication. *Id.* ¶ 25.

The loader's control lever is mounted on the right side of the loader and is accessible to an operator seated in the tractor. *Id.* ¶ 26. By manipulating the control lever forward or backward, the operator raises or lowers the loader arms. *Id.* ¶ 28. The control

lever is intended to automatically return to neutral position (halting the loader arms) when released by the operator. *Id.* ¶ 29. The control lever consists of several interlocking parts, attached by several joints, all but one of which are concealed from view by a control box. *Id.* ¶¶ 30, 32. The control lever extends through an opening at the top of the control box. *See id.* ¶ 26. The opening is covered by a movable rubber boot that wraps around the control lever. *Id.* ¶ 31. By lifting the rubber boot and sliding it up the control lever, the operator can partially view the interlocking parts and joints of the control lever through the opening of the control box. *Id.* At one of the joints (hereinafter, "the bushing joint"), a shaft attached to the control lever rotates within a bushing—allowing the control lever to hinge backward and forward to operate the loader arms. *See id.* ¶¶ 32-33. The bushing is pressed into the control box and the rotating shaft is bolted to the exterior of the control box. *See id.* ¶ 32 (image of shaft secured to bushing with a bolt). The bushing joint is visible and accessible without lifting the rubber boot, via the exposed bolt, but the bushing and the shaft themselves are not fully exposed. *See id.* ¶ 26 (image of control box exterior with bolt visible). Unlike the joints on the loader arm, the bushing joint is not equipped with a grease zerk. *Id.* ¶ 37. At the time of manufacture, Kubota applied a film of grease to the bushing joint "for ease of assembly and the prevention of rust prior to sale." Specht Appendix at 125; Specht Facts ¶ 1.

The operator's manual for the loader instructs operators to:

> Lubricate all 16 grease fittings every 10 hours of operation. Also, lubricate joints of control lever linkage every 10 hours. High quality grease designating "extreme pressure" and containing Molybdenum disulfide is recommended. This grease may specify "Moly EP" on its label.

Kubota Facts ¶ 35; *see also* Specht Appendix at 286. The instruction is accompanied by an illustration of a side-view of the loader, with arrows pointing to the eight grease fittings present on each side of the loader. Kubota Facts ¶ 35; *see also* Specht Appendix at 286. The illustration does not identify the number or locations of control lever joints that are

meant to be lubricated. *See* Kubota Facts ¶ 35; *see also* Specht Appendix at 286. In addition to the instruction in the operator's manual, a decal placed on the loader instructs operators to "lubricate every 10 hours to: all pivot pins, joints of control lever." Kubota Facts ¶ 35 (formatting omitted). The decal instruction is accompanied by an illustration of a grease gun. *Id.*; *see also* Specht Facts ¶ 22. Neither the operator's manual nor any decal warns operators about hazards that may result from a failure to lubricate the identified joints. Specht Facts ¶ 82.

The operator's manual and a decal placed on the loader further warn operators of dangers associated with using the loader to lift large shiftable objects without securing such objects with the appropriate loader attachments. Kubota Facts ¶ 43. The operator's manual specifically warns operators regarding the "[d]anger of the object rolling or sliding down the loader boom onto the operator." *Id.*; *see also* Specht Appendix at 276.

## C. Equipment Malfunction and Accident

On July 8, 2013, Philip drove Daniel to a plot of land that Daniel farmed. Kubota Facts ¶ 45. At the plot, Daniel intended to use the tractor and loader to move hay bales. *Id.* ¶ 46. Between July 8 and July 12, 2013, nobody saw or heard from Daniel, prompting Philip and his son to search for Daniel. *Id.* ¶ 47. On July 12, 2013, Philip and his son found Daniel deceased in the operator's seat of the tractor, located on the plot of land where Philip had driven him on July 8. *Id.* ¶ 48. The loader was equipped with the pallet fork attachment and was in the fully raised position. *Id.* ¶ 50.

The Allamakee County Sheriff reported to the scene and conducted an investigation. *See id.* ¶ 49. The sheriff determined that, as Daniel used the loader to lift a hay bale, the hay bale fell backwards from the fully raised position, "rolling onto the operator's compartment, striking [Daniel], causing a fatal injury." *Id.* ¶ 51; *see also* Kubota Appendix (docket no. 19-2) at 170. Upon observation of the tractor and loader, the sheriff learned that the loader's control lever periodically became stuck in the raise position,

without automatically returning to neutral position. Kubota Facts ¶ 55.

The control lever's occasional failure to return to neutral position preexisted the date of the accident. *Id.* ¶ 56. Months prior to the accident, Daniel had warned Paul that the control lever was "sticky" prior to Paul using the tractor and loader. *Id.* ¶ 57. Additionally, months prior to the accident, Philip used the tractor and loader to move piles of manure. *Id.* ¶ 58. At that time, the control lever stuck in the raise position, resulting in the full raising of the loader arm, which dumped a pile of manure on Philip in the operator's seat. *Id.* Philip subsequently informed Daniel of the malfunctioning control lever. *Id.*

### D. Condition of Tractor and Loader

The parties inspected the tractor and loader to determine its condition at the time of the accident. *Id.* ¶ 59. The inspections occurred on August 12, 2014 and November 5, 2014. *Id.*

During the August 12 inspection, the parties used the control lever to raise the loader arms. Specht Facts ¶ 58. The control lever stuck in the raise position without returning to neutral. *Id.* During the November 5 inspection, the parties again used the control lever and found that it would stick in the raise position. *Id.* ¶ 62. Subsequently, the parties disassembled the control lever to inspect the component parts. *Id.* ¶ 63. The bushing joint was rusted and corroded. Kubota Facts ¶ 61. These areas and the other control lever joints showed no evidence of lubrication. *Id.* ¶ 62.

After reassembling the control lever, the parties again tested it and found it to automatically return to neutral, albeit with some friction and resistance. *See* Specht Facts ¶ 64; *see also* Kubota Supplemental Appendix (docket no. 34-2) at 17. The parties proceeded to apply oil to the external bolt of the bushing joint, as well as to a small exposed area of the bushing joint's shaft that was accessible from the inside the control box after lifting the rubber boot. Kubota Appendix at 74. The oil was not injected into the

interior of the control lever bushing.  Specht Facts ¶ 65.  After the oil was applied, the parties again tested the control lever and found it to automatically return to neutral as intended, without significant friction or resistance.  *See id.* ¶ 66; *see also* Kubota Supplemental Appendix at 17.

The parties' inspection revealed that the rust and corrosion in the bushing joint—which accumulated due to a lack of lubrication—was the cause of the control lever malfunction resulting in Daniel's death.  Kubota Facts ¶¶ 73-75.

## VI. ANALYSIS

Specht alleges that Kubota's design of the loader was defective because it "failed to provide a method for introducing lubricant into the control lever bushing and into the joints of the control lever linkage" without disassembly of the control box.  Brief in Support of Resistance ("Specht Brief") (docket no. 29) at 16; *see also* Petition at 3-7 (Counts 1 and 2).[1]  Specht further alleges that Kubota was negligent due to its failure to reasonably instruct operators on how to properly lubricate the control lever joints and its failure to reasonably warn operators of the dangers that would result from failing to lubricate the control lever joints.  *See* Specht Brief at 22-23; *see also* Petition at 7-9.  Specht has voluntarily abandoned all other claims raised in the Petition.  Specht Brief at 25 ("Plaintiff is no longer seeking a claim for post-sale failure to warn, breach of warranties, punitive damages, or pre-death pain and suffering.").  Accordingly, the court shall grant the Motion with respect to Counts 4 through 8 of the Petition, as well as

---

[1] Specht alleges his design defect claim in two separate counts: one for "strict liability product defect (design defect)" and another for negligence.  Petition at 3, 5.  Iowa law does not recognize separate strict liability and negligence claims "based on the same design defect since both claims rest on an identical risk-utility evaluation."  *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002) (citing Restatement (Third) of Torts: Product Liability § 2).  Because Specht maintains a single design defect theory for both Count 1 and Count 2, the court shall treat the two counts as a single claim of design defect and shall apply the test established by the Iowa courts.

Specht's claim for damages for pre-death pain and suffering. Kubota argues that the court should also grant summary judgment in its favor on the remaining design defect and inadequate instructions and warning claims. Kubota also argues that certain expert opinions introduced by Specht must be stricken for violation of the Federal Rules of Civil Procedure. The court shall address this collateral issue before proceeding to the merits of the Motion.

## A. Expert Opinions

In the Reply, Kubota argues that the court must strike significant portions of an affidavit from Specht's expert, Dr. George Wandling. Reply at 4-14; *see also* Specht Appendix at 3-19 (Dr. Wandling's affidavit). According to Kubota, Dr. Wandling's affidavit includes new opinions that are untimely disclosed, as well as opinions that contradict portions of Dr. Wandling's earlier-disclosed expert report. *See* Reply at 4-6; *see also* Kubota Appendix at 106-116 (Dr. Wandling's expert report).

Federal Rule of Civil Procedure 26(a)(2) provides that a party must disclose to the opposing party the identity of any expert witness, as well as a written report containing the expert's opinions. Fed. R. Civ. P. 26(a)(2)(A)-(B). Such disclosures are required even if the expert opinions are "intended solely to contradict or rebut evidence" introduced by the opposing party. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Rule 37(c)(1) provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) ("Rule 37 does not provide for mandatory sanctions, and the district court may find that a party's failure to include a witness in the . . . Rule 26[] disclosures was substantially justified or harmless."). This rule provides

the court with "wide" discretion to decide whether to exclude evidence that is untimely disclosed. *Carmody v. Kan. City Bd. of Police Comm'r*, 713 F.3d 401, 405 (8th Cir. 2013) (quoting *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008)).

Specht timely disclosed Dr. Wandling as an expert witness and timely served Kubota with Dr. Wandling's expert report. *See* Reply at 4. A court order required the parties to disclose any rebuttal expert evidence by February 28, 2017. *See* Order Extending Deadlines (docket no. 17). Specht disclosed Dr. Wandling's affidavit containing the purportedly new and/or contradictory opinions in the Specht Appendix, which was filed on April 25, 2017. *See* Specht Appendix. Therefore, it appears beyond dispute that Dr. Wandling's supplemental opinions were not timely disclosed. As such, they are subject to being stricken unless the untimeliness was substantially justified or is harmless.

Initially, the court notes that Kubota's challenge to Dr. Wandling's affidavit appears solely in the Reply. As such, Specht has had no opportunity to respond to the issues raised. *See, e.g.*, LR 7 (providing no mechanism for a party to file a sur-reply); LR 56 (same). The court is hesitant to grant relief against a party that has had no meaningful opportunity to respond. Additionally, the court finds that Specht's untimely disclosure of the opinions appearing in Dr. Wandling's affidavit was substantially justified. Depositions of Kubota's expert witnesses occurred on March 23 and 24, 2017. Reply at 5; *see also* Specht Appendix at 37-57, 75-93 (excerpts from depositions of Kubota experts). These depositions occurred approximately one month after the deadline for disclosing rebuttal expert evidence. The court recognizes that the court's "[s]cheduling [o]rder is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Langenbau v. Med-trans Corp.*, 167 F. Supp. 3d 983, 997 (N.D. Iowa 2016) (quoting *Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 592 F. Supp. 2d 1087, 1093 (N.D. Iowa 2008)). However, to the extent Specht wished to rebut deposition

testimony with supplemental opinions by Dr. Wandling, the scheduling of depositions rendered it impossible to do so while also adhering to the court's deadline.[2]  Given this impossibility, the court finds that it was substantially justified for Specht to disclose supplemental rebuttal opinions from Dr. Wandling as soon as possible after the specified deadline.  The disclosure of such opinions on April 25, 2017—approximately one month after the depositions of Kubota's experts—did not amount to unreasonable delay.  *See United States v. STABL, Inc.*, 800 F.3d 476, 488 (8th Cir. 2015) (affirming district court's determination that untimeliness of supplemental expert report was harmless where it was served eight months after receipt of information from opposing party's expert, recognizing that it "take[s] time" for an expert to "prepare . . . updated analysis" after receiving such information).  Accordingly, the untimely disclosure of opinions appearing in Dr. Wandling's affidavit does not warrant exclusion.

With respect to Kubota's arguments that portions of Dr. Wandling's affidavit must be stricken because they contradict previously disclosed opinions, the court also finds that exclusion is unwarranted.  "Courts 'must use extreme care' when deciding whether an affidavit directly contradicts prior testimony and warrants striking." *Jensen v. IOC Black Hawk Cty. Inc.*, No. 15-CV-2082-LRR, 2016 WL 6080815, at *4 (N.D. Iowa Oct. 17, 2016) (quoting *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006)).  Kubota identifies two portions of Dr. Wandling's affidavit that purportedly contradict previously disclosed opinions.  Reply at 8-9, 11-12.  In the first portion, Dr.

---

[2] Kubota states that Specht's counsel affirmatively requested to conduct depositions in March of 2017.  *See* Reply at 5.  However, Kubota has not produced any evidence to support its assertion.  *See* LR 7(b)(4) (providing that, where requested relief "is premised upon a Federal Rule of Civil . . . Procedure that permits consideration of facts not appearing of record, then the moving party must electronically attach . . . any affidavits, other sworn materials, photographs, or documentary evidence upon which the moving party relies").  Therefore, the court declines to assume that the unfortunate scheduling of depositions was the sole fault of Specht's counsel.

Wandling identifies a Kubota design drawing that refers to the bushing joint as a "self-lubricating journal bearing" and states his opinion that Kubota failed to adequately instruct operators to lubricate the bushing joint. Specht Appendix at 8-9. Among other things, Dr. Wandling states that bushings like the one at issue "may require little to no lubrication," implying that operators may not recognize that the bushing joint required lubrication. *See id.* at 9. In the second portion, Dr. Wandling gives his opinion that the inspection of the loader, which occurred fifteen months after the accident, would not necessarily establish whether or not Daniel had applied WD-40 to the external bolt of the bushing joint. *Id.* at 18. These two opinions do not "directly contradict" Dr. Wandling's previously disclosed opinions that a lack of lubrication caused the malfunction at issue. Instead, the first portion can fairly be read to suggest that the design of the bushing joint and the allegedly flawed instructions failed to signal that lubrication of the bushing joint was necessary—even though lubrication was, in fact, necessary. Likewise, the second portion can fairly be read to suggest that evidence is unavailable to disprove that Daniel may have applied WD-40 to the bushing joint, even if such application failed to provide sufficient lubrication to prevent the malfunction at issue. These opinions do not raise sham issues but, instead, rebut suggestions by Kubota's experts that operators would intuitively identify and know to lubricate the bushing joint and that external lubrication of the bushing joint's bolt would have been effective. *See, e.g.*, *id.* at 46-47 (testimony from Kubota's expert the control lever joints that must be lubricated are "fairly obvious" and that the operator can identify the joints requiring lubrication "[j]ust by observation"); *id.* at 48 (testimony from Kubota's expert that, after spraying WD-40 on the exterior of the bushing joint, it would naturally "wick[] its way into the joint"). As such, they are not directly contradictory opinions subject to being stricken.

For the foregoing reasons, the court declines to strike the challenged portions of Dr. Wandling's affidavit. The court shall consider the affidavit when ruling on the Motion.

### B.  Design Defect

"Under a design-defect claim, a plaintiff is essentially arguing that, even though the product meets the manufacturer's design specifications, the specifications themselves create unreasonable risks." *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr. Inc.*, 816 F. Supp. 2d 631, 657 (N.D. Iowa 2011) (quoting *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006)).  The Iowa Supreme Court has adopted the "risk-utility analysis" from the Restatement (Third) of Torts: Products Liability ("Restatement Third") for its approach to design defect claims.  *See Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 504 (Iowa 2009) (citing *Wright*, 652 N.W.2d at 169).  Under this approach, "a plaintiff must ordinarily show the existence of a reasonable alternative design and that this design would, at a reasonable cost, have reduced the foreseeability of harm posed by the product." *Nationwide Agribusiness*, 816 F. Supp. 2d at 657 (internal citations omitted) (quoting *Parish*, 719 N.W.2d at 543); *accord Scott*, 774 N.W.2d at 504 n.1 (articulating a substantially similar standard (quoting Restatement Third § 2(b))).

In addition to showing a reasonable alternative design and a reasonable reduction of foreseeable harm, a plaintiff must also show that the design defect caused the plaintiff's injury.  *See Lovick v. Wil-Rich*, 588 N.W.2d 688, 700 (Iowa 1999) ("The plaintiff in a products liability action must establish a causal relationship between the alleged negligence and injury.").  "The defect in the product only needs to be *a* proximate cause, not *the* proximate cause." *Id.* (emphasis added).

Kubota argues that summary judgment is appropriate on Specht's design defect claim because: (1) the alternative design proposed by Specht is unreasonable, Brief in Support of the Motion ("Kubota Brief") (docket no. 19-3) at 12-13; (2) the loader is not unsafe in its current design and would enjoy no reduction of foreseeable harm by adopting the alternative design, *id.* at 10-11; and (3) even if a design defect existed, such defect was not the cause of Daniel's death, *id.* at 13-15.  The court shall address the alternative design

and foreseeable harm issues in tandem before proceeding to the causation issue.

### 1. Reasonable alternative design and reduction of foreseeable harm

"When technical issues are involved (issues beyond common knowledge and experience) in a products liability or a products-related case, expert testimony is required to generate a jury issue." *Benedict v. Zimmer, Inc.*, 405 F. Supp. 2d 1026, 1032 (N.D. Iowa 2005) (alteration omitted) (quoting *James v. Swiss Valley AG Serv.*, 449 N.W.2d 886, 890 (Iowa Ct. App. 1989). Technical issues requiring expert testimony include "engineering, metallurgical and medical principles." *Id.* at 1033. When such principles are at issue in a design defect case, expert testimony is necessary to establish a reasonable alternative design and the ability of such design to reduce the foreseeable harm of the challenged product. *See id.* ("Whether the device had a design defect, whether the foreseeable risks of harm the device posed could have been reduced or avoided by the adoption of a reasonable alternative design and whether the omission of such design rendered the device not reasonably safe are technical, scientific issues that cannot be fully understood by the average juror without some expert assistance.").

For its showing regarding an alternative design, Specht relies on the opinions of Dr. Wandling. Dr. Wandling concludes that "[t]he design of the Kubota front loader control assembly failed to provide a method for introducing lubricant into the control lever bushing" and that, as a result, the design rendered the loader "defective and unreasonably dangerous." *See* Kubota Appendix at 115. With respect to a reasonable alternative design, Dr. Wandling states that Kubota could have reduced the risks associated with a sticky control lever by using a grease zerk on the bushing joint, which would allow the insertion of grease directly into the otherwise-concealed bushing. *Id.* at 116. According to Dr. Wandling, this alternative design is "technically and economically feasible" because Kubota included grease zerks at the other joints of the loader that require regular lubrication. *Id.*

Kubota challenges Dr. Wandling's grease zerk alternative on grounds that: (1) the alternative design is unreasonable because it incorrectly assumes that grease is a suitable lubricant for the control lever joints, Kubota Brief at 12-13; and (2) the alternative design would not reduce any foreseeable harm because operators can easily lubricate the control lever joints under the current design, *id.* at 10-11.

When considering whether an alternative design is reasonable and whether its use would reduce foreseeable harm, the court looks to a variety of factors.

> The factors include, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing. The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. Thus, the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice among products are factors that may be taken into account.

Restatement Third § 2, cmt. f (internal citation omitted); *see also Parish*, 719 N.W.2d at 545 (indicating that, when adopting the Restatement Third § 2, the Iowa Supreme Court also adopted the corresponding commentary).

Kubota has produced evidence from its own expert that grease is an unsuitable lubricant for use in the bushing joint, thereby making the use of grease (implied in Dr. Wandling's proposed grease zerk design) unreasonable. *See* Kubota Brief at 12. According to Kubota's expert, the use of grease might "unnecessarily allow chaff and debris to accumulate in a joint, whereas the use of lubricating oil does not" and, if not regularly lubricated, such debris could "create a binding condition, whereas lubrication with oil will not." *Id.* However such evidence does not place the matter beyond dispute. Notably, Dr. Wandling disputes Kubota's characterization that grease applied through a

grease zerk can result in the accumulation of debris that will contribute to binding. To the contrary, Dr. Wandling claims that the regular application of grease ejects any debris that might accumulate in the joint and forms a barrier to further entry of debris into the joint. Specht Appendix at 12. Such disagreement between parties' experts creates a genuine issue as to the particular fact in dispute. *See United States v. Ameren Mo.*, 4:11-CV-77-RWS, 2016 WL 728234, at *12 (E.D. Mo. Feb. 24, 2016) ("When parties rely on battling experts to establish material facts, the facts are not 'undisputed' as required to grant summary judgment . . . ." (citing *Scallon v. U.S. Ag Ctr., Inc.*, 42 F. Supp. 2d 867, 870 (N.D. Iowa 1999))). Even beyond this expert testimony, Specht has produced evidence that Kubota applies grease lubricant to the bushing joint during manufacturing of the loader "for ease of assembly and the prevention of rust prior to sale." Specht Appendix at 125. Specht has further produced evidence that the operator's manual urged operators to use "[h]igh quality grease" when lubricating the loader. *Id.* at 286. This reference to "high quality grease" appears in an instruction pertaining to the lubrication of both the loader arm joints and the control lever joints, reasonably indicating to operators that the same grease lubricant is suitable for both types of joints. The significant evidence produced by Specht raises a genuine dispute as to whether grease is a suitable lubricant for the bushing joint.

Beyond the suitability of using grease lubricant in the bushing joint, which implicates the alternative design's impact on the loader's longevity, maintenance and repair, *see* Restatement Third § 2, cmt. f (listing impact on longevity, maintenance and repair as factors relevant to the reasonableness of an alternative design), the court finds that there is a genuine dispute as to other factors relevant to the reasonableness of the proposed grease zerk design. First, as noted above, the operator's manual can be fairly read to refer operators to use grease lubricant in the control lever joints, and the decal posted on the loader depicts a grease gun corresponding to the warning to lubricate

regularly. Specht Appendix at 286 (operator's manual); Kubota Facts ¶ 35 (decal); Specht Facts ¶ 22 (identifying the image as a "grease gun"). These instructions and warnings reasonably create the expectation that operators can use grease to lubricate the bushing joint, which would be facilitated by the proposed grease zerk design. *See* Restatement Third § 2, cmt. f (listing instructions and warnings and consumer expectations about a product as relevant factors). Second, Dr. Wandling states that the grease zerk that should be installed at the bushing joint would be of the same type that is installed at the other joints on the loader. Kubota Appendix at 116. The fact that Kubota already installs the same grease zerks elsewhere on the loader reasonably implies that the proposed grease zerk design would have a negligible impact on production costs, if any. *See* Restatement Third § 2, cmt. f (listing the effect on production costs as a relevant factor). Third, to the extent Kubota is correct that grease lubricant would create a "binding condition" if the operator does not regularly apply it, such outcome would not be meaningfully different than the "sticky" control lever that occurred in the instant case, wherein grease lubricant was not used. Therefore, assuming that installation of a grease zerk on the bushing joint would bring the joint into conformance with the other loader joints and would align with expectations created by the operator's manual and warning decal, the grease zerk would have the basic advantage of encouraging regular application of lubricant. *See id.* (listing the relative advantages of the two designs as a relevant factor). Accordingly, in view of the record before the court, the court finds that Specht has generated a genuine issue of material fact with respect to the reasonableness of the proposed alternative design.

Kubota argues that, even if the grease zerk design is reasonable, it would not reduce the foreseeable harm posed by the loader. Kubota Brief at 10-11. Specifically, Kubota argues that operators can "easily" lubricate the bushing joint with the current design and maintains that, because the alleged defect only manifests if the bushing joint is not regularly lubricated, the proposed grease zerk design would have no impact on the

foreseeability of harm. *Id.* at 11. In effect, Kubota argues that it is the failure to lubricate the bushing joint that creates a foreseeable harm and, because the present design allows for lubrication, an alternative design would fail to reduce the probability of harm. The court disagrees. Even accepting as true that the current design of the bushing joint allows for lubrication with oil, Specht has produced evidence that the alternative design would improve the ease and efficiency of lubrication, thereby reducing the probability of foreseeable harm. As noted above, the operator's manual and warning decal reasonably suggest to operators that grease must be applied to the bushing joint. A reasonable jury could determine that the installation of a grease zerk at the bushing joint would better conform with an operator's expectations, reduce any confusion about lubrication method[3] and, accordingly, more effectively encourage operators to regularly lubricate the control lever joints. Evidence of the relative merits of the grease zerk design over the current design is sufficient to raise a genuine dispute of material fact. *See Nationwide Agribusiness*, 816 F. Supp. 2d at 657 (requiring only that the alternative design "reduce[]" foreseeable harm, not that it eliminate it completely). Additionally, as noted above, the grease zerk design relies on the installation of the same grease zerk utilized elsewhere on the loader, indicating that the design can be instituted at reasonable cost. Accordingly, in view of the record before the court, the court finds that Specht has generated a genuine issue of material fact with respect to the proposed alternative design's ability to reduce foreseeable harm at a reasonable cost.

### 2. *Causation*

Kubota argues that, even if the grease zerk design is a reasonable alternative design that reasonably reduces foreseeable harm at a reasonable cost, summary judgment is

---

[3] Although Kubota maintains that the control lever is ill-suited to be lubricated with grease, it has not pointed to any evidence that it informed operators of this fact or that it affirmatively instructed operators to lubricate with oil. *Cf.* Kubota Facts ¶ 36 (stating only that the bushing "was designed and intended" to be lubricated with oil).

nevertheless appropriate because the defective design did not cause Daniel's death. *See* Kubota Brief at 13-15. According to Kubota, there is no evidence that Daniel would have lubricated the bushing joint even if it had not been defectively designed, such that the design itself did not cause his death. *See id.* at 13. In support of its argument, Kubota points to evidence that the various other loader joints—unassociated with the control lever—exhibited signs that they had not "been lubricated for a considerable period of time prior to the accident," even though they featured the very grease zerks proposed as an alternative design by Dr. Wandling. *Id.* at 14.

Despite Kubota's characterization of the evidence, Specht has produced sufficient evidence to generate a genuine issue of material fact regarding causation. Philip testified that Daniel carried WD-40 in a toolbox that he kept on his tractor. Specht Appendix at 245-46. Additionally, there is evidence that Daniel knew that the control lever would occasionally stick: Philip warned Daniel that the control lever was sticky when he borrowed the loader to move manure and Daniel told Paul about the lever's tendency to stick. Kubota Facts ¶¶ 57-58. Evidence that Daniel carried WD-40 on the tractor, paired with evidence that Daniel was aware that the control lever had a tendency to stick, provides circumstantial evidence that he used the WD-40 in an attempt to lubricate the control lever to fix the malfunction—yet the malfunction remained. Granted, the inspection of the loader revealed no detectable residue from WD-40 and Kubota's expert claims that, "[d]epend[ing] on the amount" of WD-40 applied, he would expect residue to remain, despite the inspection occurring fifteen months after the accident. Specht Appendix at 48-49. However, Dr. Wandling disputes the opinion of Kubota's expert regarding WD-40 residue. *See id.* at 17 (Dr. Wandling stating that WD-40 residue can become undetectable in as few as four days). In short, Specht has produced circumstantial evidence that Daniel applied WD-40 to the bushing joint, and Kubota has identified no undisputed evidence as rebuttal.

During the inspection of the tractor and loader, Kubota documented dry and solidified grease on the joints of the loader arms, reasonably suggesting that such joints had not been lubricated for a significant period of time despite the presence of grease zerks. Kubota Appendix at 74-75. However, to the extent that such evidence suggests that "none of these grease joints had been lubricated for a considerable period of time," *id.* at 74, they nevertheless suggest that Daniel greased the joints—using the grease zerks to do so—on various occasions. *See also* Specht Appendix at 13 (Dr. Wandling stating that the examination of the exterior of a joint, without disassembly of the joint, "cannot establish the amount of time that had elapsed since the last lubrication"). Additionally, it bears emphasis that the inspection of the tractor and loader occurred fifteen months after Daniel's death, raising the fair possibility that the dryness of the joints was, at least partially, the result of over one year of non-use. In any event, there is no dispute that Daniel's lubrication of the loader arm joints, however irregular, was sufficient to prevent malfunction of the loader arms.

The court recognizes that the evidence bearing on causation presents a close call. However, while the evidence that Daniel regularly lubricated the control lever bushing is largely circumstantial, Kubota's contrary evidence can be viewed to have significant weaknesses of its own. The court is guided by the principle that "[c]ausation is a question for the jury, 'save in very exceptional cases where the facts are so clear and undisputed, and the relation of cause and effect so apparent to every candid mind, that but one conclusion may be fairly drawn therefrom.'" *Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009) (emphasis omitted) (quoting *Lindquist v. Des Moines Union Ry.*, 30 N.W.2d 120, 123 (Iowa 1947)); *see also Lovick*, 588 N.W.2d at 700 (in a products liability context, recognizing that "[o]rdinarily, the question of proximate causation is for the finder of fact [and] will be decided as a matter of law only in extraordinary cases" (citations omitted)). Viewing the evidence in the light most favorable to Specht, this is not

a "very exceptional case" subject to determination as a matter of law. As such, the court finds that Specht has generated a genuine issue of material fact with respect to causation.

For the foregoing reasons, Specht has generated a genuine issue of material fact regarding his design defect claim against Kubota. Accordingly, summary judgment is inappropriate and the court shall deny the Motion with respect to that claim.

### C. Inadequate Instructions and Warnings

"Commercial product sellers must provide reasonable instructions and warnings about risks of injury posed by products." Restatement Third § 2, cmt. i. "Instructions inform persons how to use and consume products safely." *Id.* "Warnings alert users and consumers to the existence and nature of product risks so that they can prevent harm either by appropriate conduct during use or consumption or by choosing not to use or consume." *Id.* "[A] product is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings . . . and the omission of the instructions or warnings renders the product not reasonably safe." *Parish*, 719 N.W.2d at 545-46 (formatting omitted) (quoting Restatement Third § 2(c)). "Factors to consider when assessing the adequacy of instructions or warnings are content and comprehensibility, intensity of expression, and the characteristics of expected user groups." *Rock v. Smith*, 985 F. Supp. 2d 1066, 1072 (S.D. Iowa 2013) (quoting *Junk v. Terminix Int'l Co.*, No. 05-CV-608-JAJ, 2008 WL 5191865, at *6 (S.D. Iowa Nov. 3, 2008)).

As noted above, the challenged instruction appears in the operator's manual and provides as follows:

> Lubricate all 16 grease fittings every 10 hours of operation. Also, lubricate joints of control lever linkage every 10 hours. High quality grease designating "extreme pressure" and containing Molybdenum disulfide is recommended. This grease may specify "Moly EP" on its label.

Specht Appendix at 286. Accompanying the instruction is an image of the side view of the

loader, in which the eight loader arm joints visible from the side view are circled and emphasized with arrows. *See id.* There is no image of the control lever apparatus or any emphasis placed on the control lever joints. The challenged warning exists in the form of a decal posted on the body of the loader, which states: "lubricate every 10 hours to: all pivot pins, joints of control lever." Kubota Appendix at 71 (formatting omitted). Accompanying the warning is an image of a grease gun. *Id.*

Kubota argues that the instruction and warning "clearly and visibly instructed and warned users of the loader to lubricate the 'joints of the control lever' every 10 hours." Kubota Brief at 16. Kubota argues that purported flaws identified by Specht—that the instructions and warning fail to state that the control apparatus must be disassembled to lubricate the control lever joints and fail to specify that the bushing joint must be lubricated—are not, in fact, flaws because no disassembly of the control apparatus is required and the bushing joint is reasonably encompassed by references to "joints of the control lever" and "joints of control lever linkage." *See id.* at 17-19. The court agrees with Kubota and finds that the instruction and warning are adequate with respect to these particular issues. Particularly, Kubota has introduced evidence that, at least with respect to the bushing joint, lubricant may be applied via the external bolt or by lifting the rubber boot—processes that no reasonable jury would characterize as "disassembly."

Nevertheless, the court finds that a genuine issue of material fact exists with respect to the adequacy of the instructions and warnings. Specht has introduced evidence that the control box houses ten separate control lever joints reasonably encompassed by the instruction and warning. *See* Specht Appendix at 11 (Dr. Wandling identifying "10 control levers" possessing corresponding joints). However, the number of joints is not specified in the instruction or warning. Additionally, the bushing joint is the only joint that is visible or accessible in any way from the exterior of the control box, while the others are concealed by the control box. *See* Kubota Appendix at 68-70 (indicating that "a number

of the interlocking parts which comprise/include the joints . . . of the control lever" are accessible from the interior of the control box, but that the bushing joint "is secured on the exterior of the control lever box with a bolt"). Thus, even though the rubber boot of the control box may be lifted to view the interior of the control box, theoretically allowing an operator to lubricate the control lever joints located therein, the instructions and warnings provide no information to orient the operator as to its contents. *Cf. id.* at 69 (depicting the limited view of the control box interior, when viewed with the rubber boot raised). In other words, having read the operator's manual and the warning decal, an operator would understand that he or she must lubricate all of the joints located inside the control box, but would not understand with any particularity where the lubrication should be applied, with the exception of the bushing joint whose bolt is visible and accessible from the exterior. The lack of any meaningful information about the number and placement of the control lever joints within the control box is particularly stark when compared to the thorough guidance regarding the number and placement of the loader arm joints. "[T]he concept of 'reasonableness' for judging the adequacy of warnings [is] a malleable concept that is intertwined with the facts and circumstances of each case." *Daughetee v. Chr. Hansen, Inc.*, 960 F. Supp. 2d 849, 869 (N.D. Iowa 2013). Because the content regarding the control lever joints is lacking to a degree that would frustrate an operator's ability to comply with the instructions and warning's directives, the court finds that Specht has generated a genuine dispute of material fact regarding the adequacy of the instructions and warnings. *See id.* ("Whether the warning actually given was reasonable in the circumstances is to be decided by the trier of fact." (quoting Restatement Third § 2, cmt. i)).

As with the design defect claim, "[e]stablishing liability for failure to instruct or warn also requires a plaintiff to establish that the lack of instructions or warnings caused the plaintiff harm." *Rock*, 985 F. Supp. 2d at 1072 (citing *Wright*, 652 N.W.2d at 168).

Despite generating a genuine issue of material fact regarding the adequacy of the instructions and warning, the court finds that Specht has failed to generate a genuine issue of material fact regarding causation. Although the instructions and warning contain no information about the number and placement of the control lever joints visible solely from within the control box, it is undisputed that the only joint implicated in the malfunction at issue was the bushing joint that is readily visible from the exterior of the control box. Regardless of any inadequacies with respect to particular joints, both the instructions and the warning clearly instruct operators to lubricate the "joints of control lever." Even granting that the inadequate instructions and warning may have frustrated Daniel's ability to identify and lubricate the concealed control lever joints, a reasonable jury could not conclude that the inadequacy of the instructions and warning prevented Daniel from identifying and lubricating the visible bushing joint. Indeed, as noted above, Specht relies on circumstantial evidence to imply that Daniel did, in fact, lubricate the bushing joint. *See* Resistance at 25 ("Daniel knew that the front loader . . . control lever was sticky, Daniel used WD-40 as a spray lubricant, and he would have it in his small tool box on the incident tractor."). Although this evidence raises a genuine dispute of material fact regarding causation on Specht's design defect claim, it simultaneously suggests that Daniel knew to lubricate the bushing joint despite any inadequacy in the instructions and warning. Furthermore, assuming he used WD-40 to do so, he used a suitable lubricant despite the lack of specification in the instructions and warning. *See* Specht Appendix at 48 (Kubota expert referring to WD-40 as a "penetrating oil" and suggesting that it is a suitable lubricant). Because Daniel was fully aware of the need to lubricate the particular joint at issue despite the inadequate instructions and warning, Specht cannot point to the inadequate instructions and warning as the proximate cause of Daniel's death. *Cf. Krajewski v. Enderes Tool Co.*, 469 F.3d 705, 710 (8th Cir. 2006) (in case applying Nebraska law: "If, despite deficient warnings, 'a user is fully aware of the danger which a warning would

alert him or her of, then the lack of warning is not the proximate cause of the injury.'" (quoting *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 688 (8th Cir. 1981))). The fact that Daniel's purported attempts to lubricate the bushing joint were ultimately unsuccessful or ineffective due to a design characteristic of the joint is unrelated to the instructions and warning, but instead implicates Specht's design defect claim discussed above. Accordingly, the court finds that Specht has failed to generate a genuine issue of material fact with respect to causation.

For the foregoing reasons, Specht has failed to generate a genuine issue of material fact regarding his inadequate instructions and warning claim against Kubota. Accordingly, summary judgment is appropriate and the court shall grant the Motion with respect to that claim.

## VIII. CONCLUSION

In light of the foregoing, Kubota's Motion for Summary Judgment (docket no. 19) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is denied with respect to Specht's design defect claim against Kubota (Counts 1-2) and is granted with respect to Specht's remaining claims against Kubota (Counts 3-8).

**IT IS SO ORDERED.**

**DATED** this 6th day of June, 2017.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA